Thank you, Your Honor. Catherine Young for Appellant Timothy Thorne. Mr. Thorne is appealing his sentence for possession of stolen mail. And I will, Your Honor, try to reserve about five minutes of my time for rebuttal so that I don't impose on the Court's kindness. Mr. Thorne raises a number of issues. The first one I want to turn to is his claim that the District Court erred in calculating the advisory guideline range, specifically with respect to the intended loss enhancement. And before going into the substance of that fact, the clear and convincing evidence standard was applicable here and was required because the enhancement had an extremely disproportionate effect on his sentence. The intended loss enhancement increased his base level 14 levels and increased the low end of his guideline range from 12 months to 60 months. So it was extremely disproportionate. At the District Court level, the District Court accepted that standard. The government accepted the standard as well. But on appeal, the government is trying to walk that back and say that due process does not require clear and convincing evidence. But as this Court knows, the Temkin case in 2017, this Court held that the clear and convincing evidence standard survives fecals. So we have to evaluate what the District Court did and lay the prism that clear and convincing evidence was required for the application of this enhancement. So now I want to turn to the facts of the case. I'm sorry. Judge Corman, I'll speak up. Take the mic's directional. I'm facing it. I'll ensure that the problem is fixed the next time. I want to ask you about the definition of enhancement. This involves the calculation of the sentencing guidelines based on the crime that he committed. It's not an upward departure, which normally the government bears the burden of proof on if it wants to upwardly depart from the sentencing guidelines. So this is a guideline calculation based on the crime that he committed. I don't know why that isn't a preponderance of the evidence test. In fact, I think we we so held in a case called United States versus IMS at 780 F 3rd 1285. This is a guideline calculation, and I think the word enhancement has to be has to be distinguished from enhancing by upwardly departing as opposed to calculating a guideline. No, absolutely, Your Honor. It isn't, and it is not a departure. It is an enhancement, but I think that the or at least it's enhancing the base level. But I think that the government still bears the burden of proving the enhancement. And in this case, you said that it's based on the crime. In fact, the only thing he pled to was the bare minimum. He pled to knowing possession of stolen mail. He did not plead to 1000 pieces of mail or to any individual specific piece of mail. And that being the case, any attempt to charge him with 1000 pieces of mail is an enhancement that requires we're arguing clear and convincing evidence. And the Hymas case I addressed in the brief. It's a case in which the defendant in that case pled to one loan, and the district court said, Okay, charging you with loss with respect to that one loan to which you pled satisfies due process because you pled to it, you knew the consequences from the loan. But with respect to the loans you didn't plead to clear and convincing evidence requires that we find we must find those facts by clear and convincing evidence because that's what due process requires. We can't enhance your sentence for things that you didn't plead to. In this case, he did not plead to anything but knowing possession of stolen mail. And therefore, when you're charging him with 1000 pieces of mail, and you're increasing a sentence by four years, we're arguing that clear and convincing evidence applies. And I think that's consistent with the Hymas case. I'm sorry, Your Honor, what, what difference would it make on the facts of this case? Whether you apply to clear and convincing or preponderance of the evidence? Um, the just what the district court said was, I mean, I want to answer your question. But the district court said that it would be naive to think that he was a by just an innocent bystander, and that circumstantial evidence to a joint responsibility. Our point is joint responsibility as to what that was the finding that the district court was required to make by clear and convincing evidence. And I want to turn to the language of the guideline. 1b 1.3 application note three says four times that in order to find, you know, joint responsibility, the district court has to make specific findings as to what the defendant exactly agreed to do. Four times they make that point. They say in order to determine the defendant's accountability for the conduct of others, the court must first determine the scope of the criminal activity the particular defendant agreed to undertake. In other words, the scope of the specific conduct and objectives embraced by the defendant's agreement. It goes on to say the accountability of the defendant for acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Goes on further, acts of others that are not within the scope of the defendant's agreement, even if known or reasonably foreseeable, are not relevant conduct. And then they further go on to say that relevant conduct does not include conduct of members of conspiracy prior to defendant joining the conspiracy. So in other words, they five times they repeat, you have to find out the district court must make findings as to what the defendant specifically intended. What conduct did he agree to go into? And then you've got 2b 1.1, which is the language of the enhancement, which says you have to find what the defendant purposely agreed to the loss of the agreed to impose. So over and over again, I'm sorry, I can't hear you. Sorry. Wasn't the circumstantial evidence on which the district court relied sufficient to show that joint effort, including was it a message or an email which suggested that he was one of the principal leaders of this effort? The circumstantial evidence does not take into account the fact that Mr. Thorne came to this road trip with no experience in stealing mail. He was taught by one of the participants in how to steal mail. Each of these participants came to the experience with histories of stolen mail, with stolen mail and personal identifying information, unauthorized access devices in their personal property with Mr. Thorne knew nothing about. And that's what he told the district court. I will accept responsibility for the activities on the road trip. But I didn't know anything about what these other people have long on the road trip. I'm sorry, the activities on the road trip involved him making actually breaking into mailboxes. Yes. And we're saying that we don't know anything about the actual activity. What we're disputing is that he was charged with, for example, $650,000 of the $750,000 with stuff was checks that were in Regina Rodriguez's backpack that he knew nothing about. So almost all of the loss didn't come from the road trip. It came from the fact that he didn't know. Well, let me turn to that, Your Honor. There was one exchange, not between Mr. Thorne. And this was within the scope. It was about two weeks before the arrest. It was within the scope of the road trip. It was a text message between Brittany and one of the co-defendants, not Mr. Thorne. And Brittany was asking for a check. And the co-defendant sent her a check, which didn't work. So Brittany said, can you ask Tim if he can give me a check or if he can give me a money transfer? And Brittany said, ask him yourself. I mean, the co-defendant told Brittany, ask him yourself. And Brittany said, I can't ask Tim. I don't know how. I don't have his contact information. I don't know how to reach him. So that's one thing. Tim and Brittany did not know each other. She didn't have his contact information. She didn't have anything. But then, I'm sorry. The person who he was communicating with said to ask your client would suggest a fairly significant piece of extraordinary circumstantial evidence that he was the one who was in possession and would make the decision. Well, I don't think so, Your Honor, because first of all, she's asking one of the co-defendants. The co-defendant sends her one thing and then brushes her off. So she's in desperation. She asks Tim for it. But what's also significant, not only that she didn't know Tim, but that when the co-defendant responded, Tim wants to know if you're going to pay him, Brittany dropped the idea of getting a check from Tim and asked for a money transfer from Tim. So the exchanges to that point had been between the co-defendants. Then the co-defendant forwards Brittany's message to Tim, which, as we discussed in the brief, Tim never opened the message. But the message has nothing to do with stolen mail. The message only asks if Tim can give her a PayPal transfer, a Zelle transfer, or a money transfer. The message that was ultimately forwarded to Tim, which he didn't open, had nothing to do with stolen mail. Mr. Thorne, was he in the car ride from Nevada to California? Yes, he was, Your Honor. And were most of the checks found from either Nevada or halfway from Nevada to California? And if so, can you reasonably infer that he was involved since they were on this road trip from Nevada to California and had stolen checks in that vicinity? Well, we've broken it down in the brief, and I notice I'm running out of time, so I won't go into detail. It's broken down in the brief. In fact, $650,000, as I said, was in Regina's possession, and something like $450,000 was outside of California. But one thing, since you raised that point, I do want to focus on one check, which is in evidence. It's CSD-134. It's one check. It's $200,000. That check alone, if found not to be intended loss, would reduce Mr. Thorne's offense level. That check is dated outside the date of the road trip. It's outside of the area where the government claimed the clusters are. It's also a corporate check, and the point of the road trip was they were going to wealthy areas and breaking open people's mailboxes. They weren't going to corporations and rifling through corporate mail. This is a check from a corporation to a bank. It wouldn't have been in someone's mailbox. So, this check alone would require reversal of the intended loss enhancement. And at this point, unless there are any further questions, I'd like to reserve some of my time for rebuttal. I have one question. Do I understand correctly that the unauthorized access devices found in the car, like credit cards or things like that, did not enter into the sentence? That's correct, Your Honor, because the probation officer said she hadn't been provided with a breakdown of the items. Like, under ONUSO, you have to produce usability of those types of items. The government didn't meet its burden of proving the amounts attributable to those items. Okay, thank you. We'll do this so you can plan your rebuttal. You've got almost three minutes left. We're going to raise that to five minutes, so you get five minutes of rebuttal. And now we'll hear from Mr. Cho. And Mr. Cho, we've scheduled 15 minutes for you, but because I'm giving an extra three minutes to Ms. Young, if you need a few extra minutes, just ask for them. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Skyler Cho on behalf of the United States. Under either standard of proof, the District Court's lost findings were not clearly erroneous, as they were supported by the record and were not illogical or implausible. Today, the government will highlight four categories of evidence, namely the text messages, defendants' longstanding relationships with his co-defendants, defendants' travel pattern, and the commingling of the California and non-California checks. First, the text messages on a co-defendant's phone found in the car showed that at least 12 days before his arrest, defendant was selling stolen checks to be washed and cashed. The cell phone user replied, he said, you gonna pay him, and if you are, he needs his money first. And the co-defendant forwarded Brittany's message to defendant. The text messages show that even prior to his arrest in California, defendant was already known to others as a source for stolen checks. It's implausible that a person who had never before mailed, pardon me, never before stolen mail or attempted to cash a stolen check would suddenly develop a reputation for being a source of stolen checks. Rather, it's plausible that defendant had this reputation because he had engaged in a stolen check scheme before his arrival in California. Thus, it was reasonable for the district court to reject defendant's claim that he first learned to steal mail on his trip to California and had no knowledge of any checks with non-California addresses. Second, the record shows that defendant had long-standing relationships with his co-defendants. All four of the defendants in this case resided in Las Vegas where some of the stolen checks were originated and came to California together. Rodriguez provided defendant with drugs and he had known her for several years. Co-defendant Alexis Anderson was the mother of defendant's two-year-old daughter and Amanda Anderson was her auntie. Notably, defendant stated that co-defendant Amanda Anderson cashed money orders in Las Vegas and California. This statement shows that defendant knew that co-defendant Amanda Anderson was fraudulently cashing money orders even before they came to California. Third, the district court's finding is also supported by defendant's travel pattern. Just nine days after his arrest in this case, defendant was arrested in Utah in possession of numerous checks including a watch check in the amount of $350. Co-defendant Alexis and Amanda Anderson were also present in that car. Approximately a month later, back in California, defendant was pulled over and officers found several pieces of mail in the vehicle as well as several credit cards bearing different names in defendant's wallet. So, defendant's travel pattern shows that defendant was already engaged in a scheme to steal mail and sell checks or watch checks and was furthering that scheme in California when he was arrested in this case. Fourth, the district court's finding is supported by the co-mingling of the California checks with the non-California checks. For example, defendant attributes the orange Nike bag to a co-defendant based on his self-serving statements. But the record shows that over half of the checks in that bag were from California, including all the checks in the bag and estimating the loss amount or the intended losses was supported by the record and it was not illogical or implausible. Defendant also attributes the black backpack to a co-defendant, but approximately one-third of the checks in that bag were from California. Again, including the non-California checks was supported by the record and it was not illogical or implausible. Rather, the record supports the inference that defendant wasn't seeking to inflict pecuniary harm for just the California checks in those bags. He was seeking to inflict pecuniary harm for all of the checks in the bags. What's the government's position in terms of the standard review here? Is it clear and convincing evidence or preponderance of evidence? I know in the Ninth Circuit we've been sole holdout in applying post-poker clear and convincing evidence in some instances, but frankly when you look at our case law, it's not exactly clear when we apply clear and convincing evidence and when we apply preponderance of evidence. What's the government's position with facts here? Which standard applies? Your Honor, the government continues to maintain that this case does not require application of the clear and convincing evidence standard. As you note, other courts of appeals have concluded... Is it because it's uncharged conduct here? Your Honor, specifically, I guess that's the alternative argument that even if the heightened standard applies, the loss enhancement did not have an extremely disproportionate impact relative to the offense of conviction. But I think the focus of the government's argument is really just Beckles, the case decided by the Supreme Court in 2017 and that Beckles requires this court to revisit the issue. They're the Supreme Court reason that because advisory guidelines do not fix the permissible sentence and merely guide the district court's discretion, they're not subject to vagueness challenges under the due process clause. So if a due process challenge to a sentencing enhancement on vagueness grounds fails because advisory guidelines merely guide the district court's discretion, then a due process challenge to a sentencing enhancement on standard-approved grounds also fails because the advisory guidelines merely guide the district court's discretion. Thus, the reasoning of Beckles is clearly irreconcilable with the reasoning behind this court's adoption of the clear and convincing evidence standard for certain sentencing enhancements. Counsel, assuming that's correct for a moment, haven't we had Ninth Circuit cases that have rejected that argument? Yes, Your Honor. You may be referring to the Temkin case in which this court concluded that Beckles does not foreclose this court from satisfying due process concerns by sometimes requiring a heightened standard of proof. But in Miller v. Gammy, Your Honor, this court stated that a three-judge panel should consider itself bound by intervening higher authority that undercuts the reasoning underlying the prior circuit precedent. And that's what Beckles did. But if a prior three-judge panel looked at that issue and concluded that Beckles doesn't undermine the reasoning, then isn't our panel bound by that even though you might have a strong argument in Bank or at the Supreme Court? Well, Your Honor, in the opinion in Temkin, it's unclear the extent to which, I guess, the court in Beckles, I'm sorry, the court in Temkin considered whether Miller v. Gammy, I guess, required the court to overrule Staten because of the intervening higher authority. And also, Your Honor, it's notable that Temkin is an unpublished case. Okay. So if Temkin is unpublished, it doesn't limit our panel's discretion. Yes, Your Honor. Okay. Thank you. Can you address Ms. Young's point about the $200,000 check, her argument that you should be responsible for that? Yes, Your Honor. I mean, the $200,000 check was found in one of the bags that the defendant attributed to one of his co-defendants in his self-serving statement. But if you look at the record, the record reflects that that check was found in a bag containing an abundance of checks from California. So really, the question is whether the district court clearly erred in concluding that all the checks in that particular bag should be counted in terms of calculating intended loss. And the government's position is that the co-mingling of those checks showed that defendant's intent wasn't limited to just the California checks in that bag. When the, rather, the defendant's intent was to inflict harm for all of the checks in that bag, including the check in the amount of $200,000, which notably bore an address in Simi Valley, California, and the record reflects that other items were also recovered from Simi Valley, California. And, Your Honor, if I may continue as well to address some of the other issues. The district court did not clearly err in estimating the loss as greater than $550,000. The court only need make a reasonable estimate of the loss. And absent countervailing evidence showing that defendant intended to take less, the district court may reasonably infer that a defendant intends to take up to the full face amount of stolen checks. Here, the PSR did not include any loss for 15 blank checks or the 154 unauthorized access devices found in the car. And that, I guess, the fact that those checks and those devices were not included in the intended loss amount buttresses, the district court's reasonable estimate that intended loss was at least $550,000. With respect to the other issues, the government submits unless the court has other questions. I have no questions. Let me see if Judge Lee. What would the guidelines have been if you didn't count the $200,000? Your Honor, if the $200,000 was not counted, I believe that... Sir, Your Honor, are you referring specifically to that $200,000 check? Yes. Yes, so that may have pushed the intended loss amount to below $550,000, which may have resulted in a lower offense level by two levels. I understand that, but what would it have been? Your Honor, I apologize. My ability to conduct simple math calculations right now is failing me, but I can go ahead and submit a supplemental briefing if this court should ask. The district court actually downwardly departed. The guideline range, the minimum guideline range, was 63 months. It was capped at five years by the maximum sentence, but the guideline range was really 63 months, and he gave 48, which was roughly about a 15-month downward departure from the applicable guideline range. I don't think that taking the two points off would have had any effect, but I'm not sure. It would have lowered the guideline range, but it would not have taken it down below 48 months. Yes, Your Honor, and there's some indication in the record that the government, I'm sorry, the court, the district court in sentencing defendant to 48 months and downwardly departing by 12 months from the 60-month guideline term was... The guideline terms were higher. Yes, Your Honor. The guideline term was higher, but it was capped at 60 months because of the statutory maximum in this case, which was 60 months. And so from that 60 months, the district court, I guess, very downwards, or downward departed by 12 months. And the explanation for that departure reflected that the district court did consider that maybe the loss amount might have overstated the offense a bit and also did take into account the rehabilitation that the defendant was able to achieve while on release in this case. Okay, anything further? No, Your Honor, unless the court has any further questions, the government submits. Okay, well, I have no questions, but if Judge Carmen Lee has a question, then we will permit that. But without that, we'll move to Ms. Young's rebuttal. Thank you, Your Honor. The first thing I want to turn to is Judge Carmen's question about how the guideline range would be changed. You're correct, Your Honor. The guideline range would go down to, I think, 51 months, which is above what the district court sentenced Mr. Thorne to. But the law is clear that even if the district court gives a downward variance, as they did in this case, I'm sorry, a Booker variance, if the guideline range is incorrectly calculated, it still has to be reversed because the district court is required to consider the guideline range. It's the starting point, it's the touchstone, it has to be referred back to. So if there's an error in the calculation of the guideline range, it requires reversal, even if, as in this case, the district court sentenced below what would have been the revised guideline range. And that check is only one of the checks at issue. We're claiming that $650,000, along with this check, was in Regina Rodriguez's possessions and wasn't attributable to Mr. Thorne. So this is the check that's in evidence, so that's the check I was pointing to, but it's only an example of what we're claiming is not attributable to Mr. Thorne. I want to respond now to Mr. Cho's arguments. He first focused on the text message, and I addressed it somewhat earlier. Let me focus on it just a little bit more. Again, this is within the parameters of the road trip. And Brittany did not even have Mr. Thorne's contact information. She didn't know how to reach him. And the minute that the co-defendant responded to say that Mr. Thorne wanted to know how much he was going to be paid, Brittany dropped any indication of asking for a stolen check, and she asked for a money transfer instead. So all of that suggests that she didn't know him, she didn't know if he could provide a check, she was just desperate and asking for things. And when she knew he might give her something, she focused on asking for some kind of money order. And again, Mr. Thorne did not open this text message. Second, Mr. Cho argued that there was a longstanding relationship between Mr. Thorne and the other co-defendants. But again, these co-defendants had histories of stolen mail. They had convictions for stolen mail and access devices and those types of things. Mr. Thorne did not, and he didn't know them in that context. He knew Ms. Rodriguez as his drug dealer. He knew Alexis as his baby mama. He didn't know them necessarily in the context of their activities with stolen mail. Mr. Cho also referred to the travel pattern, but the travel pattern he was talking about was the travel pattern after the offense. Mr. Thorne said at the time he was penniless and homeless. So the fact that he continued to travel on the road trip even after the arrest doesn't prove that he knew anything about what had gone on with these co-defendants before his arrest. Fourth, Mr. Cho talked about commingling checks. And Mr. Cho seemed to be suggesting that just because a check is from California, it was necessarily acquired during the road trip. And the check that we've been talking about, the $204,000 check, CSD-134, disproves that because it's dated several months before the road trip. Just because a check has a California source on it doesn't mean it was acquired during the road trip. It could have been acquired by the co-defendants prior to the road trip. During Mr. Cho's argument, he also talked about the PSR not including unauthorized devices and checks. But again, since the government didn't provide the information that the PSR needed to evaluate those items, they were not included. We don't know if they're usable under ONUSO or if they would have changed the outcome at all in terms of intended loss. Counsel, I have a question for you, if I may, please. Yes, please. So maybe this $200,000 check could have been unknown to the defendant. However, why is it not plausible that he has knowledge of that, even though it's in a co-defendant's pack? Experience with stealing mail. It doesn't make any sense to suggest that just because he came along with them on a road trip, they're willing to give him hundreds of thousands of dollars of their efforts that they individually have undertaken to acquire stolen mail. And in that respect, I think that the text exchange is kind of instructive, because here we've got Brittany texting one of the co-defendants desperate for money. She owes somebody money. She's desperate for money. And the co-defendant is fighting her and not willing to give her something, finally gives her a worthless check. These people held on to their ill-gotten gains. They weren't going to share it. And therefore, you've got Regina, who's got a history of prosecutions for stolen mail. She's got all this stuff on her computer, in her property. There's no indication that she'd give hundreds of thousands of dollars to Mr. Thorne just because he accompanied them on the road trip. I see I'm out of time, so unless there are any further questions. One last question. Did the defendant testify during the sentencing? When you say these were his contentions, were they just made by the lawyer, or was there sworn testimony? He allocuted, but the point that I'm making about him saying he didn't know what was going on was made to law enforcement. He had an interview with law enforcement in which he said, I didn't know the extent of the stuff. I went along with them. Yes, I participated in some things while we were on the road trip. I had no idea what these other people had in their personal property. That statement was made to law enforcement. Okay. Unless there are other questions, and hearing none, the Thorne case shall be submitted. Ms. Young and Mr. Cho, I want to thank you both for putting up with the stresses of video argument and doing an admirable job as advocates. We appreciate it. So this case shall be submitted. And the parties will hear from us in due course.
judges: Gould, Korman, Lee